IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

DOMINIC BULONE,           )
                                   )
        Plaintiff,     )
                                   )
        v.           )     Case No.
                                   )     14-3392-CV-S-REL-SSA
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,   )
                                   )
        Defendant.    )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Dominic Bulone seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Title II of the Social Security Act ("the Act"). I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On July 1, 2013, plaintiff applied for disability benefits alleging that he had been disabled since May 10, 2012. Plaintiff's disability stems from post traumatic stress disorder ("PTSD"), depression, anxiety, chronic fatigue, lung infections, rashes, irritable bowel and joint pain. Plaintiff's application was denied on August 21, 2013. On May 9, 2014, a hearing was held before an Administrative Law Judge. On May 23, 2014, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On July 31, 2014, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.    STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision.  Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991).  However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because

2

substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

Yes = not disabled.
No = go to next step.

3

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Natalie Maurin, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record shows that plaintiff earned the following income from 1983 through 2013:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1983 | $ 621.73 | 1999 | 27,170.88 |
| 1984 | 2,018.08 | 2000 | 28,137.15 |

4

| | | | |
|---|---|---|---|
| 1985 | 7,654.24 | 2001 | 27,473.36 |
| 1986 | 8,878.95 | 2002 | 32,946.72 |
| 1987 | 10,922.26 | 2003 | 33,217.90 |
| 1988 | 9,400.24 | 2004 | 37,164.85 |
| 1989 | 18,595.09 | 2005 | 27,718.97 |
| 1990 | 17,742.35 | 2006 | 33,747.25 |
| 1991 | 22,425.56 | 2007 | 31,259.55 |
| 1992 | 27,418.56 | 2007 | 31,259.55 |
| 1993 | 21,189.81 | 2009 | 28,979.79 |
| 1994 | 12,350.62 | 2010 | 29,475.30 |
| 1995 | 13,078.22 | 2011 | 4,901.38 |
| 1996 | 19,221.61 | 2012 | 18,131.51 |
| 1997 | 23,977.59 | 2013 | 0.00 |
| 1998 | $25,715.61 | 2014. | 0.00 |

(Tr. at 290-299).

**Disability Report - Field Office**

On July 8, 2013, Interviewer M. James of Disability Determinations met face to face with plaintiff regarding his application for disability benefits (Tr. at 313-315). The interviewer observed that plaintiff had no difficulty with reading, understanding, coherency, concentrating, answering, sitting, standing, walking, using his hands or writing (Tr. at 314). The interviewer added the following observation: "Claimant was

cleanly dressed and very muscular with a forceful and demanding attitude in his questioning as to why he was not considered a wounded warrior in order to get approved for disability benefits with SSA. No physical or mental limitations were observed." (Tr. at 315).

**Function Report - Third Party**

On July 22, 2013, plaintiff's wife, Stephanie Bulone, completed a Function Report - Third Party (Tr. at 333-340). Mrs. Bulone is with plaintiff constantly. During the day plaintiff naps frequently and watches television or uses the computer. Plaintiff has "horrible insomnia, nightmares, yells in his sleep." He is not always compliant with wearing his CPAP.[1] Plaintiff has to be reminded to shave and brush his teeth, his grooming is poor. He is able to drive, and he can go out alone except he does not like being around people. He shops in stores and by mail.

Plaintiff's condition affects his ability to lift, climb stairs, squat, kneel, bend, understand, follow instructions, hear, see, complete tasks, get along with others, remember and concentrate. His condition does not affect his ability to sit, stand, reach, walk, or use his hands (Tr. at 337). When asked how long plaintiff can pay attention, Mrs. Bulone wrote, "sometimes less than a minute."

_____

[1]"If you have moderate to severe sleep apnea, you may benefit from a machine that delivers air pressure through a mask placed over your nose while you sleep. With CPAP, the air pressure is somewhat greater than that of the surrounding air, and is just enough to keep your upper airway passages open, preventing apnea and snoring." http://www.mayoclinic.org/diseases-conditions/sleep-apnea/basics/treatment/con-20020286

Plaintiff was fired from his job at the prison due to violence (Tr. at 339). He does not handle changes in routine well because he is very controlling. Plaintiff has been using a cane for the past six years, it was prescribed by a doctor, and he uses it daily (Tr. at 339).

**Function Report**

In an undated Function Report, plaintiff described his typical day (Tr. at 344-351). He gets up around 9:00 a.m., has coffee and breakfast while he watches the news, feeds his dogs and cats, walks the dogs for 50 minutes, takes a shower, watches television or plays on the computer, takes a 1 to 2 hour nap, has lunch, goes outside for a while, watches television, has dinner, and then watches television until he goes to bed around 10:00 p.m.

Plaintiff prepares his own meals, and it takes him about 40 minutes. He does a little bit of laundry and he mows. It usually takes him a couple of hours to do these things. He is able to drive and can go out alone. Plaintiff reads and watches television every day. In 2005 he began to distrust people.

Plaintiff's condition affects his ability to lift, squat, bend, stand, kneel, hear, climb stairs, remember, complete tasks, concentrate, understand, follow instructions and get along with others. His condition does not affect his ability to reach, walk, sit, or use his hands (Tr. at 349).

Plaintiff was fired from a job for "fighting and more?" (Tr. at 350). He uses a cane "most every day" (Tr. at 350).

7

### B. SUMMARY OF TESTIMONY

During the May 9, 2014, hearing, plaintiff testified; and Natalie Maurin, a vocational expert, testified at the request of the ALJ. Before the testimony, the ALJ made the following comment: "And what are the severe impairments that we're looking at? Because I'm -- I noted as Mr. Bulone came in that he was kind of bent over and using a cane in the right hand, and I don't see -- I'm not sure what that's from." (Tr. at 37). The subsequent discussion between the ALJ, plaintiff and his attorney concluded with the statement that plaintiff does have a back impairment but was walking with a cane because of his knees -- Dr. Jones told him to use a cane (Tr. at 37-39).

### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 49 years of age (Tr. at 41). He is married and has two children living at home (Tr. at 41). He lives on 1 3/4 acres of land (Tr. at 41). Plaintiff is 5' 9" tall and weighs about 230 pounds (Tr. at 41).

Plaintiff has a high school education and the equivalent of an associate's degree in criminal justice (Tr. at 41). While he was working, he was in college part time, trying to get a degree so he could move up the ladder at work (Tr. at 68). When he stopped taking classes, it was because he lost interest (Tr. at 70). From 1996 to 2010, he worked with the Department of Corrections ("DOC"); from 1984 through 2006 he was in the Army and the National Guard (Tr. at 42). He was a corrections officer with the DOC and then was promoted to supervisor (Tr. at 42). He was in charge of a lot of violent offenders, and he was in charge of staff, security and others (Tr. at 42). He was promoted to supervisor in 2000 (Tr. at 42).

8

Plaintiff was in the Army from 1985 to the end of 1986, then he joined the Reserves for two years (Tr. at 42). After that he joined the National Guard (Tr. at 42-43). He retired as a staff sergeant (Tr. at 43). He trained in bridge building, demolitions, weaponry, etc. (Tr. at 43). He was required to carry large, heavy metal equipment (Tr. at 43).

When plaintiff was in Iraq, a Humvee in front of him was blown up, and soldiers were killed (Tr. at 45). Plaintiff felt terrible, he thought it should have been him and not them (Tr. at 45). Plaintiff got into a fistfight with one of his commanding officers (Tr. at 45). Plaintiff thought the officer was abusing his power, and in the heat of the moment they got into a fight (Tr. at 45-46). Another time plaintiff was barking orders at a soldier who did not listen, so plaintiff "smacked him around" (Tr. at 46). The military told plaintiff he needed to retire, and they gave him an honorable discharge with a 60% disability, which was later raised (Tr. at 46).

Plaintiff started his career with DOC at the Missouri State Penitentiary in Jefferson City (Tr. at 47). They shut down in 2004 and moved to a new facility called Jefferson City Correctional Center (Tr. at 47). Plaintiff was in Iraq when this occurred (Tr. at 47). The new facility is referred to as "The New Walls" and is a maximum security prison (Tr. at 48). When plaintiff was working there, he had problems "going off" on supervisors and blowing up on staff (Tr. at 48). He was having a lot of anger issues (Tr. at 48).

On one occasion when he was a supervisor, plaintiff ordered his staff to watch the door while he physically "roughed up" some inmates (Tr. at 48). Plaintiff "went off

and started hitting him" (Tr. at 48-49). He got in trouble for doing that, but the prison worked with him and helped him get a diagnosis of PTSD and he left "on good terms" (Tr. at 49). In the military, they called it anxiety and depression, but the state referred to it as PTSD (Tr. at 49). Plaintiff took medical retirement from the DOC (Tr. at 49). Plaintiff's military experience and his job at the prison were both high stress positions (Tr. at 49-50).

Plaintiff has experienced other stress in his life too (Tr. at 50). His daughter had an appendicitis and also had cancer, and all of that was removed (Tr. at 50). His mother had a stroke, and his wife was in a severe car accident (Tr. at 50). Just recently, plaintiff's brother committed suicide (Tr. at 50). He was paranoid schizophrenic and plaintiff blames himself for that (Tr. at 50). Plaintiff's father was killed in a car crash, and plaintiff blames himself for that too (Tr. at 50).

Plaintiff slapped his brother around in the past (Tr. at 55). He has hit the walls with his fist a few times but he has never hit his wife and children (Tr. at 55). Plaintiff is sometimes depressed, sometimes "ticked off" and irritable (Tr. at 55). He has more bad days than good (Tr. at 55).

In 2006 when he got back from Iraq, he started having other problems (Tr. at 43). He felt funny, could not catch his breath, "and a lot of things" (Tr. at 43). He went to the VA for treatment, and "it was like a slow process of different things accumulating." (Tr. at 43-44). Plaintiff was diagnosed with some kind of granulomas in his lungs -- he was scared he was going to die (Tr. at 44). Even though plaintiff never smoked a day in his life, his doctor said his were the second worst set of lungs she had ever seen on a

10

patient his age (Tr. at 44). Plaintiff cannot walk very far without stopping to rest (Tr. at 44). At night he has to use a CPAP (Tr. at 44). "[W]hen it falls off, I, I don't even put it on, because it wraps around my neck and stuff, and when I have these nightmares, it just, it just, it just goes nuts." (Tr. at 44).

Plaintiff believes he was exposed to chemicals when he was in Iraq (Tr. at 50). He has granulomas in his lungs, and he has some growths in his nose (Tr. at 51). He had those surgically removed (Tr. at 51). Since his return from Iraq he has had surgeries on both knees and a shoulder (Tr. at 51). He had surgery on both knees before he went to Iraq too (Tr. at 51). Dr. Jones told plaintiff he needs knee replacements in both knees (Tr. at 51-52). The surgery on his shoulder was reconstructive (Tr. at 52). When he was in Iraq he was holding some bridge parts and he felt a pop and a burning sensation (Tr. at 52). He went to the TMC and got a couple of shots and x-rays but they could not find anything wrong (Tr. at 52). After the shots, it felt good for a while, but then he was getting weaker and weaker and just kept getting the shots and pills (Tr. at 52).

Plaintiff has knee pain every day in both knees but the left is worse than the right (Tr. at 60). He rates his left knee pain anywhere from a 5 to an 8 on a scale of 1 to 10 (Tr. at 60). His right knee pain is a 5 (Tr. at 60). His left shoulder pain is between a 5 and an 8 (Tr. at 60). His elbow pain is rated a 4 or 5 (Tr. at 62). He has stomach pain a couple times a week that doubles him over, and he rated that a 5 or a 6 (Tr. at 60). When he has heart palpitations, his chest pain is at least an 8 (Tr. at 60). Whenever he experiences a stressor, he has that chest pain (Tr. at 61).

11

Plaintiff also suffers from chronic fatigue (Tr. at 53). He also has irritable bowel syndrome, and sometimes he has to use a pad because of that (Tr. at 53). This problem has gotten worse over the past 12 months (Tr. at 53). He was asked when he was diagnosed with chronic fatigue, and he did not know (Tr. at 53). Plaintiff sometimes loses his memory. He is OK with long-term memory, but he sometimes cannot remember anything he did a couple days ago (Tr. at 67-68). Plaintiff's heart will start "fluttering and beating," and because of this Dr. Jones diagnosed panic attacks (Tr. at 59). Any time plaintiff gets excited, irritable, or anxious, he has a panic attack (Tr. at 59). Plaintiff now takes medicine for that (Tr. at 59).

Plaintiff does not trust strangers, and he does not like going to stores (Tr. at 69). He never goes grocery shopping, but he sometimes goes to Wal-Mart only when he has to, i.e., "if the wife makes me" (Tr. at 69). His therapist will tell his wife to take plaintiff out, but he does not like to go out (Tr. at 69). He goes to Wal-Mart about once a month (Tr. at 69).

Plaintiff has problems with his elbows and all of his joints hurt a lot (Tr. at 54). The main problems with his joints are his shoulders, his elbows and his knees (Tr. at 54). He has had injections in all of his joints (Tr. at 54). Plaintiff also has carpal tunnel syndrome -- he was diagnosed by Dr. Jones about 12 or 13 months ago (Tr. at 54). Plaintiff has headaches, which he referred to as migraines, two to three times a week (Tr. at 54, 61). His headache pain is always an 8 or higher (Tr. at 62). He has a new medication called Naproxen (a non-steroidal anti-inflammatory) which helps relieve his

12

headache symptoms (Tr. at 54-55). Sometimes plaintiff has trouble seeing and focusing (Tr. at 55).

In a typical day, plaintiff will get up around 8:00 and have coffee and breakfast (Tr. at 56). He and his wife sit and talk for a bit (Tr. at 56). Plaintiff will go feed and pet his dog then come back in the house because that makes him very tired (Tr. at 56). Plaintiff enjoys reading books but after 30 minutes he cannot concentrate (Tr. at 56). He takes a nap and then gets up to have lunch (Tr. at 56). He and his wife visit for a bit and he relaxes on the porch, then he goes inside to watch television until it is time for bed, around 9:00 or 10:00 (Tr. at 56, 57).

Plaintiff has to take several medications to sleep through the night (Tr. at 61). He takes something to fade out the nightmares, but when that wears off he can remember bits and pieces of his nightmare and he wakes up either sweaty or with a racing heart (Tr. at 61). Plaintiff has nightmares at least every other day (Tr. at 61).

Plaintiff usually naps for about two hours (Tr. at 57). He takes a nap whenever he feels tired (Tr. at 57). Plaintiff likes to read any type of history -- military history, Founding Fathers type material (Tr. at 57). He enjoys playing card games with his family (Tr. at 57). He used to love hunting but he cannot tolerate that anymore (Tr. at 58). He is getting rid of most of his guns now (Tr. at 58). He last went hunting in the fall of 2010, he went deer hunting (Tr. at 58). Plaintiff cannot hunt anymore because the noise of the guns causes too many memories and flashbacks (Tr. at 58). Also, he can no longer walk a long way in the woods because he gets too tired (Tr. at 58-59).

13

If he is having a good day, he can throw in some laundry or load the dishwasher (Tr. at 62). He does not have many good days (Tr. at 62). Plaintiff's wife does the cooking (Tr. at 62). She only lets him wash his own clothes, not hers (Tr. at 62). He does not carry a basket; when he does laundry, he will throw in a shirt and a pair of pants and that's it (Tr. at 63). Plaintiff needs no help with personal care (Tr. at 63). Plaintiff's kids help with the chores at home (Tr. at 63).

Plaintiff can stand for about 20 minutes as long as he is leaning on something (Tr. at 63). He can walk about 100 feet and then he has to rest (Tr. at 63-64). Whenever his knees flare up, i.e, his knee pain is a 5 or higher, he uses a cane (Tr. at 64). Plaintiff went from crutches after surgery to a cane per Dr. Jones (Tr. at 64). Plaintiff cannot climb ladders (Tr. at 64). He cannot squat because of his knees (Tr. at 66). He can get down on his knees, but it will take him a while and it is painful (Tr. at 67). He can bend at the waist but it hurts a little bit in his low back, and he has to be careful because of his knees (Tr. at 64-65). He can reach forward OK with his left hand, but when he leans toward the back reaching is problematic (Tr. at 65). He has trouble gripping heavy things; he has to grip a gallon of milk with his right hand instead of his left (Tr. at 65). Plaintiff cannot lift anything heavier than a gallon of milk even with his right hand (Tr. at 66).

Plaintiff drives locally, not long distances (Tr. at 66). Although he needs glasses, he was in a hurry on the day of the hearing and forgot them (Tr. at 67).

Plaintiff was asked why he cannot work now (Tr. at 68). He said, "I'm totally mentally and physically chronically ill." (Tr. at 68). He said he developed a phobia

about being around people when he was in class, and he started to have attendance problems at work when he came back from Iraq (Tr. at 70-71). He never had attendance problems before going to Iraq (Tr. at 71). He also started coming in late sometimes (Tr. at 71).

After the vocational expert testified, plaintiff testified again (Tr. at 78-79). He may be able to perform assembly work if he did not have carpal tunnel syndrom (Tr. at 79). His left hand is really bad; his right had is OK at times, but plaintiff has issues with both hands (Tr. at 79). Also, he would get frustrated and "just start punching and doing dumb things again." (Tr. at 79). Plaintiff is very particular about his surroundings[2] and

---

[2]Plaintiff actually presented this testimony essentially by way of "yeah" answers. When asked whether he could perform assembly type work, plaintiff only mentioned his hands. Then the following occurred:

Q. (by counsel) Well, and Dominic, what I'd like to focus in on, I think, is how do you think that would affect you mentally?

A.    It -- I, I, I couldn't do it now.

Q.    Why?

A.    Because my focus, my, my mental, my -- I would get frustrated and start just punching and doing dumb things again.

Q.    Right.

A.    I've got to take medication just to control myself.

Q.    Yeah. One of the things that you do is, you, you -- are you very particular about your surroundings, how things --

A.    Yeah.

Q.    -- are organized, that --

A.    Yeah.

Q.    -- sort of thing?

A.    Yeah.

Q.    Do you have a problem if things are -- seem disorganized --

A.    Yeah.

Q.    -- maybe seem jumbled? A messy desk, for instance?

A.    Yeah, I get frustrated.

Q.    Okay. Do you think a quick-moving assembly process, do you think that would cause you issues?

A.    Oh, yeah, yeah.

15

he has a problem if things seem disorganized, for example a messy desk (Tr. at 79-80).

## 2. Vocational expert testimony.

Vocational expert Natalie Maurin testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes corrections officer, DOT 372.667-018, medium as generally performed, heavy as performed by plaintiff, SVP of 4;[3] working corrections supervisor, DOT 372.137-010, light as generally performed, heavy as performed by plaintiff, SVP of 6; and engineering supervisor, DOT 869.664-014, heavy, with an SVP of 4 (Tr at 72-74).

The first hypothetical involved a person who could lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk six hours per day; sit six hours per day; could not climb ropes, ladders or scaffolds; could occasionally climb ramps or stairs, kneel, crouch, or crawl; should avoid concentrated exposure to pulmonary

---

Q.   Okay. What if you had to sort, sort things for instance?
A.   Sort things?
Q.   Yeah.
A.   Same thing.
(Tr. at 79-80).

[3]Specific Vocational Preparation (SVP) is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation. This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs. An SVP of 4 means over 3 months up to an including 6 months. An SVP of 6 means over 1 year up to and including 2 years.

16

irritants, temperature extremes, vibration and work hazards. The person is able to understand, remember and carry out simple instructions consistent with unskilled work; and can tolerate occasional contact with coworkers and supervisors but no contact with the general public (Tr. at 75).

Such a person could not perform any of plaintiff's past relevant work (Tr. at 75). The person could, however, work as an assembler, DOT 706.684-022, light with an SVP of 2. There are 2,000 jobs in Missouri and 100,000 in the nation (Tr. at 75). The person could work as a labeler, DOT 920.587-014, light with an SVP of 2. There are 1,000 jobs in Missouri and 60,000 in the nation (Tr. at 75-76). The person could work as a laundry aide, DOT 302.685-010, light with an SVP of 2. There are 3,000 jobs in Missouri and 224,000 in the nation (Tr. at 75-76).

The second hypothetical was the same as the first except the person could lift a maximum of 10 pounds and stand or walk for 2 hours per day (Tr. at 76). The vocational expert testified that such a person could work as a circuit board assembler, DOT 726.684-110, sedentary with an SVP of 2. There are 2,000 jobs in Missouri and 87,000 in the nation (Tr. at 76). The person could work as a document preparer, DOT 249.587-018, sedentary with an SVP of 2. There are 3,000 jobs in Missouri and 242,000 in the nation (Tr. at 76). The person could work as an address clerk, DOT 209.587-010, sedentary with an SVP of 2. There are 1,000 jobs in Missouri and 96,000 in the nation (Tr. at 76-77).

If a person needed to lie down and rest from 30 minutes to 2 hours per day at unpredictable times, the person would be unemployable (Tr. at 77). If a person

17

consistently missed work one day a month, the person could still work, since the typical absenteeism allowance is anywhere from 10 to 14 days (Tr. at 78). If the person missed work twice a month on a consistent basis, the person would be unemployable (Tr. at 78).

### 3. Plaintiff's prior testimony.

For background and clarity, I am including a brief summary of plaintiff's testimony during an earlier application for disability benefits. This hearing took place on May 1, 2012.

Plaintiff's alleged onset date in that case was September 4, 2010 (Tr. at 88). He was asked what happened around that date to cause him to become disabled.

> I got back from Iraq in '06. And it started -- like a bunch of symptoms started happening. And I didn't know what it was. And I was having trouble controlling my temper. And I didn't know. And I kept going to doctors and different things and counselors. And eventually they found out in the long sense I had what they call post-traumatic stress syndrome. . . . I lost my temper a few times and before I did something really stupid I went to the warden and the boss and we both thought it was [wise] to seek help and that's what I did.

(Tr. at 89). The reason plaintiff quit the prison is because he went from yelling to getting physical (Tr. at 130). Now that he is on medication and in therapy, he thinks he is "stabilized pretty good" but even though he is taking medications, that does not mean he can't snap (Tr. at 130). When he feels himself getting to that point, he will leave the situation by going fishing or going outside, just getting out of the area so his temper can calm down (Tr. at 130-131). "[I]f I get in my mood either I remove myself from the situation or somebody's going to get hurt." (Tr. at 131). In his classes, he sits in the

back of the room, and if he gets irritable he leaves early (Tr. at 132). He has had to do that a few times (Tr. at 132). He has made excused for not going to class a couple times per semester (Tr. at 132).

Plaintiff is married to his high school sweetheart (Tr. at 90). They have four daughters who, in 2012, were 22, 21, 17 and 14 (Tr. at 90). Plaintiff spent 5 years in active duty in the National Guard, and then he was in the National Guard Reserves for 17 years (Tr. at 98).

When plaintiff was in Iraq, plaintiff's wife was hit by a drunk driver (Tr. at 91). She is now on disability -- she has PTSD from the accident, and her back and knees are bad (Tr. at 91, 115). Plaintiff's family lives on his wife's disability check and plaintiff's disability income from the Veteran's Administration ("VA") (Tr. at 91). At one point he had an 80% impairment rating but his attorney was fighting for several years for unemployability and he finally got it -- he is now 100% impaired (Tr. at 91-92). Plaintiff has not been working since September 4, 2010 (Tr. at 94). Plaintiff drew sick pay until the end of 2010 (Tr. at 95). Then he got income in 2010 and 2011 for long term disability for being a state employee (Tr. at 96). At the time of the hearing he was still getting paid for long-term disability through the state's insurance company (Tr. at 96-97). He stopped working because of his medical condition -- "because of my temper and that kind of stuff." (Tr. at 95-96).

Plaintiff has a driver's license with no restrictions (Tr. at 92). He drives to school twice a week and he drives to his therapy appointments (Tr. at 92-93). During the

summer he goes fishing with his kids, he might run down to the hardware store or grocery store (Tr. at 93).

Plaintiff's doctor, Linda Sharp, told him not to run, but she advised him to try and walk as much as he can (Tr. at 102). Plaintiff was seeing Dr. Twitty for mental health once every three months (Tr. at 104). Dr. Twitty has not placed any restrictions on plaintiff due to his health (Tr. at 104). Plaintiff's medications are generally effective in helping with his mood and his pain (Tr. at 105-106). Plaintiff had knee surgery in 2007, the year after he got back from Iraq (Tr. at 107). Plaintiff was not using any kind of brace or cane, and he said he was "doing pretty good, and I don't want to go back to the cane stuff again." (Tr. at 107). Plaintiff does exercises with rubber bands twice a week for his shoulder and both legs (Tr. at 107).

Plaintiff said his worst problem was the breathing, but once he had surgery to remove sinus tumors he was a lot better (Tr. at 110). Now he only has a little bit of pain (Tr. at 110). When asked about his shoulder and knee pain, he said those areas of his body were not as bad as his lungs (Tr. at 110). But the sinus surgery and medications pretty much took care of his lung pain (Tr. at 110). The medications and exercise therapy have also "pretty much" helped with his knee and shoulder pain (Tr. at 110-111). Now plaintiff's main disabling condition is his temper combined with his fatigue (Tr. at 111).

Plaintiff has panic attacks that usually occur because he missed a dose of medication (Tr. at 128). Every now and then if he does not take his medication on time, his heart will start thumping (Tr. at 128).

20

When plaintiff takes his medication, he does not have nightmares, or at least he cannot remember them (Tr. at 111, 134). On a good night, he gets 8 hours of sleep (Tr. at 111). Sometimes he has trouble sleeping when he stays up late to watch movies with his kids (Tr. at 111-112). In that case, he takes naps the next day (Tr. at 112). Plaintiff is taking college classes as therapy -- to get him to be around other people (Tr. at 112). At the time of the hearing he was taking 9 credit hours (Tr. at 112-113). He is using his veteran's benefits to go to school but it is only for therapy, he does not believe it would be good for him to use their placement office and try to move into a position he could do after he graduates (Tr. at 135). Plaintiff schedules his classes so that he only has to go to school two days a week (Tr. at 113). He expects to graduate in May 2015 (Tr. at 135).

Plaintiff tries to walk a half mile with his wife every day for exercise, and at the same time is walking his dogs (Tr. at 114). It takes him 30 to 40 minutes to walk a half mile (Tr. at 123). On days when he does not attend classes, he studies and reads, he attends his kids' sporting events (one is a cheerleader, one plays volleyball) (Tr. at 114-115). Almost every other day[4] he is at one of their games (Tr. at 115). Plaintiff's wife does most of the cooking (Tr. at 115). Plaintiff tries to avoid doing laundry, but he will do it when he has to (Tr. at 115-116). Plaintiff uses a riding lawn mower to cut the grass -- he has about an acre and a half (Tr. at 116). His kids do the chores like

---

[4]Although when being questioned by the ALJ plaintiff testified that he goes to his daughters' games every other day, when asked by his attorney how often he really goes, he said, "I've only been at like one this whole [school] year so far." (Tr. at 127).

vacuuming, mopping and cleaning (Tr. at 116). One of the kids takes his wife to do the grocery shopping (Tr. at 117). Plaintiff does not go grocery shopping because he hates crowds and he just doesn't like going (Tr. at 129). Plaintiff will go out to eat or go to the movies only when his wife demands it, and when they do go, he will sit with his back to the wall because he does not trust other people (Tr. at 117).

Plaintiff said that he could lift at most 100 pounds (Tr. at 118-119). He could do this 12 to 15 times over an 8-hour period (Tr. at 119-120).

## C.    SUMMARY OF MEDICAL RECORDS

The above summarized testimony from the May 1, 2012, hearing took place 10 days before plaintiff's May 10, 2012, alleged onset date. This is his alleged onset date because it is the day after his last application for disability benefits was denied. There are no medical records for the eight months following his alleged onset date.

On January 14, 2013, plaintiff saw Dr. Paul Jones about plaintiff's various aches and pains (Tr. at 446-449). "The hands [are] doing well. We did inject them. The hands are not falling asleep. No weakness of the hands. He states that the low back is doing well. He has pain in the left medial elbow. This started [in the] last 60 days. He thinks that he fell and caught himself." Plaintiff had full range of motion in his upper extremities and normal muscle testing in his fingers, wrists, elbows and shoulders. Dr. Jones noted that plaintiff displayed "appropriate behavior. There is good attention span." He performed an ultrasound of the elbow. "I did not see an actual rupture of a tendon." Dr. Jones assessed pain in the left elbow, rule out fracture; carpal tunnel syndrome resolved; and low back pain, improved. Plaintiff was sent for an elbow x-ray

22

and an orthopedic consult was recommended (Tr. at 389, 449). "I looked at an US

[ultrasound] and slight irregular surface by medial epicondyle, but not sure if true." An

x-ray of the left elbow was requested. The x-ray showed no fracture, but "minimal

degenerative changes" (Tr. at 449).



On January 15, 2013, plaintiff was

seen by Dr. George Parkins in an

orthopedic surgery consult due to

complaints of left elbow pain (Tr. at 390-

391). "Pain over medial epicondyle for

past 2-3 months after he lifted something heavy." Plaintiff said he had an ultrasound

that showed "something was ripped" in his elbow. Dr. Parkins noted that the ultrasound

did not mention a tear but reported a possible cortical irregularity. Plaintiff had not tried

physical therapy or injections, was not taking non-steroidal anti-inflammatories, and did

not report numbness or tingling in the joint. On exam, no tenderness was noted, and

the elbow was stable to varus and valgus stress.[5] X-ray showed no fractures or

dislocation, no obvious avulsions.[6] "Discussed physical therapy with patient and that

this is the first line treatment for this issue. Patient refused to attend physical therapy

stating, 'I know my body better than you, I know something is torn that needs fixed.'

---

[5]Tests to assess the integrity of the ligaments.

[6]An avulsion fracture occurs when a small chunk of bone attached to a tendon or ligament gets pulled away from the main part of the bone.

23

Discussed with patient that MRI is the only additional imaging modality that would evaluate the soft tissues around the elbow, and that this is usually not necessary for epicondylitis.[7]  Patient again refused to attend physical therapy stating 'I know it won't work' and adamantly requested MRI.  This has been ordered".

On Friday, January 18, 2013, a social worker telephoned plaintiff about his application for the Caregiver Support Program,[8] but he was not home (Tr. at 446).

On Thursday, January 24, 2013, a social worker telephoned plaintiff about the Caregiver Support Program, but he was not home (Tr. at 446).

On January 31, 2013, plaintiff had a therapy session with social worker Becky Sawyer (Tr. at 436-438, 486-487).  "He reports occasional thoughts related to wishing

---

[7]"Tennis elbow (lateral epicondylitis) is a painful condition that occurs when tendons in your elbow are overloaded, usually by repetitive motions of the wrist and arm. Despite its name, athletes aren't the only people who develop tennis elbow.  People whose jobs feature the types of motions that can lead to tennis elbow include plumbers, painters, carpenters and butchers.  The pain of tennis elbow occurs primarily where the tendons of your forearm muscles attach to a bony bump on the outside of your elbow. Pain can also spread into your forearm and wrist.  Rest and over-the-counter pain relievers often help relieve tennis elbow.  If conservative treatments don't help or if symptoms are disabling, your doctor might suggest surgery." http://www.mayoclinic.org/diseases-conditions/tennis-elbow/home/ovc-20206011

[8]The military's Caregiver Support Program provides the following benefits to caregivers (in this case plaintiff's daughter and wife):
•Monthly stipend
•Travel expenses (including lodging and per diem while accompanying Veterans undergoing care)
•Access to health care insurance (if the Caregiver is not already entitled to care or services under a health care plan)
•Mental health services and counseling
•Comprehensive VA Caregiver training provided by Easter Seals
•Respite care (not less than 30 days per year)

he could have done something to prevent his brother's suicide but seems to be keeping it in perspective. . . . Still thinks he has nightmares although doesn't remember content and just believes that because his wife says he tosses and turns and talks in his sleep." Plaintiff said his pattern was to stay up late watching television or playing on the computer. He tried to stay busy around the house. "Is no longer going to school due to increase in stress and may or may not return in future." Plaintiff's mental status exam was normal. He was dressed neatly, he had good eye contact, his speech was normal, he had no psychosis, his thought process was logical and goal directed, his attitude was pleasant, his mood appeared only "mildly depressed." Plaintiff reported stability in both his mood and irritability. Ms. Sawyer assessed generalized anxiety disorder and PTSD with a GAF of 65.[9]

On February 7, 2013, plaintiff saw Dr. Kathryn Bauer, an orthopedic surgeon, about his left elbow pain (Tr. at 434-436). "Pain over medial epicondyle [see diagram on page 23] for past 2-3 months after he lifted something heavy." On exam plaintiff had full range of motion with flexion, extension, supination and pronation. He was tender over the medial



epicondyle, nontender over the lateral epicondyle (see diagram on page 23). His elbow was



[9]A global assessment of functioning of 61 to 70 means some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

25

stable.  X-rays showed no fractures or dislocation.  Dr. Bauer recommended physical therapy, but plaintiff refused and said he knew it would not work.  He insisted on an MRI even though Dr. Bauer stated an MRI was not necessary.  She scheduled an MRI at plaintiff's request.

On February 26, 2013, plaintiff's daughter was approved to be his primary caregiver and his wife (who is disabled) was approved to be plaintiff's secondary caregiver through the Caregiver Support Program (Tr. at 424-425).  In reviewing all of the areas with which plaintiff would need assistance, it was noted that he is independent in dressing, toileting, feeding, and ambulating although he used a cane. The record also notes that he is "continent of bowel", and he specifically denied irregular bowel elimination (Tr. at 426).  Plaintiff denied any difficulty with preparing meals, doing housework, doing laundry, shopping, transportation, using the telephone, managing his medications, and managing his finances (Tr. at 426).  There were no mobility concerns (Tr. at 427).  When asked if there were firearms in the house, the answer was, "Yes, handguns and rifles."  Plaintiff's mental status exam was normal. His mood was described as calm (Tr. at 427).  Plaintiff and his caregiver denied any changes in mood or behavior, denied any new signs or symptoms.  "Pt has mood swings that are under control at present." (Tr. at 429).

On Friday, March 1, 2013, a social worker telephoned plaintiff in regard to his application for a caregiver due to his mental health condition (Tr. at 423).  Plaintiff's wife said he was "gone today but should be able to call this provider on Monday."

On Wednesday, March 6, 2013, the social worker again tried to reach plaintiff by telephone regarding his application for a caregiver due to his mental health condition (Tr. at 423). Plaintiff was not home, and the social worker left a message asking plaintiff to return the call.

On March 22, 2013, plaintiff had a therapy session with Becky Sawyer (Tr. at 418-420, 484-485). "Veteran reports overall believes he is doing OK. In regards to family and processing death of brother and father he states that it shows up sometimes but he tries to focus on other things. He reports he belies he is doing OK with it. He has one of his father's classic cars and is hopeful the weather will improve so he can work on it. He talked about some basic day to day stressors but nothing to indicate there were problems with his coping ability." Plaintiff's mental status exam was normal. He was dressed neatly, he had good eye contact, his speech was normal, he had no psychosis, his thought process was logical and goal directed, his attitude was pleasant. His mood appeared only "mildly depressed." Plaintiff did not report remembering any specific nightmares. He continued to report improvement and stability regarding overall mood and irritability. Ms. Sawyer assessed generalized anxiety disorder and PTSD. His GAF was 65 (i.e., mild symptoms).

On May 21, 2013, plaintiff had chest x-rays which showed ill-defined pulmonary nodular densities which had actually decreased in size since plaintiff's 2010 CT scan leading the doctor to note that the nodular densities "appeared to have waxed and waned in size." (Tr. at 383-384, 415, 454).

That same day plaintiff saw Stephanie Granneman, a nurse practitioner, for a routine visit and refill on medications (Tr. at 411-417). Plaintiff said his main issues were his right elbow and fatigue. The elbow pain had been going on for the past six months. He saw a doctor in about February, and this was 2 to 3 months after he lifted something heavy. Plaintiff had not tried physical therapy or injections, he was not taking non-steroid anti-inflammatories. He reported "occasional numbness in his hand at times" and sometimes the entire hand at night or if he holds onto the steering wheel driving for a period of time. Due to a death in the family, plaintiff had missed his appointment for an MRI on his elbow after having demanded that he have one. Nurse Granneman noted that an x-ray from January showed only mild degenerative joint disease in his elbow.

Although plaintiff's pulmonary nodule had been stable since 2012, plaintiff said he wanted to have it rechecked. "Per last pulmonary noted, last x-rays done in April 2012, stable on CT series unchanged pulmonary nodule. Ordered today for chest x-ray as patient wishes to have rechecked -- discussed with patient [he] had been stable with previous CT -- wishes to proceed."

With regard to plaintiff's chronic fatigue, he said he has a CPAP but he only wears it "rarely, maybe only once a week if that." Plaintiff said he didn't like the mask. A new CPAP mask was provided to plaintiff (Tr. at 408). Plaintiff's lung exam was normal. He denied new respiratory symptoms. He denied any change or worsening of his psychiatric symptoms. He was noted to be pleasant but anxious to get going because he had a dentist appointment after this visit.

28

Plaintiff's extremities were normal except he had some tenderness in his elbow. Plaintiff was told to take Motrin as needed for pain. He again declined physical therapy. Nurse Granneman encouraged daily use of the CPAP.

With regard to anxiety, plaintiff said he was "doing OK". Lynn Yoder performed a depression screen which was 0 -- "negative screen for depression." When he was asked whether he was feeling down, depressed, or hopeless, he said, "not at all." "Recommendation was made for the Veteran to increase activity and participate in a weight management program." Plaintiff declined a referral to an exercise/weight management program.

On Thursday, May 24, 2013, someone from Dr. Michelle Twitty's office called plaintiff but he was not home. A message was left with plaintiff's wife requesting that plaintiff reschedule a follow up since he missed his last appointment with this psychiatrist and had cancelled the appointment before that (Tr. at 410, 483-484). Mrs. Bulone was told that plaintiff's Clonazepam (treats anxiety) would be refilled with only enough to last until his follow-up appointment.

On May 30, 2013, plaintiff saw Becker Sawyer for 30 minutes of therapy (Tr. at 404-406, 480-481). "Veteran reports overall believes he is doing OK. Symptoms appear to be managed with medication regimen. . . He spends a lot of time at home. He said his wife has difficulty leaving house a lot so he finds himself at home wanting to be with her. He acknowledges it would be helpful to get out more and recognized it would be helpful for him to exercise more." Plaintiff's mental status exam was normal -- he was dressed neatly, he had good eye contact, normal speech, no psychosis, thought

process was logical and goal directed, attitude was pleasant.  His mood appeared only

"mildly depressed."  Plaintiff reported that he had had no nightmares; "the nightmares

appear to be managed with medication."  Plaintiff continued to report stability and

improvement with mood.  He had no problems staying focused while talking with

people.  He was assessed with generalized anxiety disorder and PTSD.  His GAF was

65 (i.e., mild symptoms).  Ms. Sawyer notified Dr. Twitty, plaintiff's psychiatrist, that

plaintiff had not gotten a refill of Clonazepam and would be out soon.  Dr. Twitty

commented:  "Patient last seen in October. Left message with wife/caregiver on 5/22

that patient needed to reschedule with provider as he had not been able to come to last

2 scheduled appointments and patient has not rescheduled."

That same day paperwork was prepared for the Caregiver Support Program,

indicating that plaintiff qualifies due to a mental health condition (Tr. at 401-403).

Plaintiff reported his current pain level a 6.  He said his anxiety and anger issues had

increased.

On May 31, 2013, an in-home assessment was completed in connection with

plaintiff's approval for the Caregiver Support Program (Tr. at 400-401).  His daughter

was designated as his caregiver.

On June 4, 2013, Lori Ann Spry, a social worker, prepared documentation in

connection with the Caregiver Support Program (Tr. at 398-400).  That same day Dr.

Twitty's office called plaintiff's home to attempt to schedule a follow-up appointment (Tr.

at 406, 482).  Plaintiff was not home.

On June 5, 2013, plaintiff telephoned Dr. Twitty's office (Tr. at 396-398, 477-479). He requested a refill of Clonazepam. The record states, "Patient has missed last couple appointments. Will request approval for 1 fill with 1 refill to last until appointment from Dr. Thiele, collaborating physician."

On June 10, 2013, plaintiff had a pulmonary function test performed (Tr. at 375-382). Flow volume loop was normal, spirometry was normal, total lung capacity was normal (Tr. at 381-382). DLCO[10] was mildly reduced, suggesting a loss of alveolar-capillary membrane[11] units; however, there was no significant change in DLCO as compared to his last study in April 2012, and even back to 2008 (Tr. at 382). His spirometry values had increased and his lung volumes were stable (Tr. at 382).

On June 25, 2013, plaintiff was seen for a second opinion for follow up of lung nodules because he had not had a CT scan of his chest in more than a year (Tr. at 392). "He has no new pulmonary symptoms." Plaintiff denied worsening shortness of breath, cough, or chest pain. This was a second opinion at the request of plaintiff (Tr. at 385). On exam he was noted to be in no distress, and he rated his pain as a 1 (Tr. at 387, 394). His lung exam was normal, extremities were normal (Tr. at 394). Impression was, "Multiple pulmonary nodules: stable on serial CT scans since 2007. No need for further follow up." Chest x-rays could be done as needed. Plaintiff had a mild diffusion defect on his pulmonary function tests, but 2D echocardiogram was

---

[10]DLCO is a medical test that determines how much oxygen travels from the alveoli (tiny sacs) of the lungs to the blood stream.

[11]An alveolar-capillary membrane is a thin tissue barrier through which gases are exchanged between the alveolar air and the blood in the pulmonary capillaries.

normal and V Q scan (to detect evidence of blood clots in the lungs) was normal. "Repeat pulmonary function tests in May 2013 did not show significant change in DLCO." Plaintiff's obstructive sleep apnea was noted to be stable (Tr. at 396).

On June 30, 2013, an addendum was added to plaintiff's medical record of May 22, 2013, when Nurse Granneman referred plaintiff for a chest x-ray, pulmonary function tests, and pulmonary clinic (Tr. at 417). "Multiple pulmonary nodules: stable on serial CT scans since 2007. No need for further follow up." Nurse Granneman told plaintiff to return in one year for chest x-rays "per patient wishes for follow up of lung nodules." (Tr. at 418).

On July 1, 2013, plaintiff filed his application for disability benefits.

On July 22, 2013, plaintiff had an MRI of his elbow which showed likely tendinosis[12] and tiny joint effusion (swelling) (Tr. at 455-456). He saw Dr. Carl Giacchi afterward (Tr. at 462-464). He had full range of motion in his upper extremities. He was noted to have appropriate behavior and good attention span. Muscle testing in his upper extremities was normal. Dr. Giacchi administered a steroid injection in plaintiff's elbow. He was told to use ice and non-steroidal anti-inflammatories for elbow pain. Plaintiff was told to call if he did not get relief from the injection, and he would be scheduled for physical therapy. Plaintiff also saw Dr. Michelle Twitty this day (Tr. at 465-468, 474-477). "Patient reports he is doing okay. He has been at VA all day with appointments. . . . He doesn't like crowds, he prefers to watch the Cardinals on TV. He

---

[12]Tendinosis is a degeneration of the tendon's collagen in response to chronic overuse; when overuse is continued without giving the tendon time to heal and rest, such as with repetitive strain injury, tendinosis results.

is not taking classes right now." Plaintiff's mental status exam was normal: "mood: euthymic, affect: broad, sleep: good, appetite: fair, anxiety: improved, decreased panic attacks. Energy: fair, grooming and hygiene: good, insight: good, judgement: good. Denies SI, HI [suicidal/homicidal ideation]. Content of thought: logical, flow of thought: goal directed." Plaintiff said he had been getting together with other Veterans. "Patient reports doing well with improvements in mood and anxiety recently." Dr. Twitty assessed generalized anxiety disorder and PTSD with a GAF score of 65 (i.e., mild symptoms). She continued him on his same medications, encouraged him to get physical activity, and encouraged him to continue meeting with other Veterans socially.

On July 25, 2013, plaintiff had a therapy session with Becky Sawyer (Tr. at 458-459, 472-474). Plaintiff said he wanted to go shooting again, "wanting to be able to hunt next season. He worries about 'losing it' so has avoided using weapons for several years." Ms. Sawyer recommended plaintiff listen to weapons on the internet or watch a friend target shoot. He indicated a willingness to begin trying. "Discussed group options and at beginning of session he was in agreement but after further thought decided he would possibly attend next opportunity as he may be going out of state to visit his mother and wasn't sure how often he would be available." Plaintiff's mental status exam was normal. He was dressed neatly, he had good eye contact, normal speech, logical and goal directed thought process, a pleasant attitude. His mood "appeared mildly depressed, anxious." Plaintiff denied nightmares but said he wife tells him he talks in his sleep. "Nightmares appear to be managed with medication." Plaintiff reported stability in both his mood and irritability. He denied any problems with

33

being able to stay focused. Ms. Sawyer assessed generalized anxiety disorder and PTSD with a GAF of 65 (i.e., mild symptoms).

On August 6, 2013, psychological consultant Mark Altomari, Ph.D., found that plaintiff had mild to moderate limitations in functioning but retained the ability to understand, remember and carry out simple work instructions and interact adequately with peers and supervisors, although he might benefit from a work environment with limited social interaction requirements (Tr. at 165).

On September 26, 2013, plaintiff had a therapy session with Becky Sawyer (Tr. at 471-472). "Veteran reports overall, things are going well. He is busy with family, children. Goes to bed late, discussed routine and learned he is drinking 2-3 cups of hot tea late in the evening while watching television. Discussed changing to decaffeinated tea which he wasn't aware was available. He sometimes takes naps during the day. He said he is comfortable with this routine". Plaintiff said he was "exercising when he can." Plaintiff's mental status exam was normal. He was dressed neatly, had good eye contact, normal speech, no psychosis, logical and goal-directed thought process, pleasant attitude, and his mood was pleasant and cooperative. "Discussed having one nightmare when he was out of medication. Nightmares appear to be managed with medication." Plaintiff continued to report stability with both mood and irritability. He reported no problems with his ability to focus. Ms. Sawyer assessed generalized anxiety disorder and PTSD with a GAF of 65 (i.e., mild symptoms).

34

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Carol Boorady entered her opinion on May 24, 2014 (Tr. at 8-28).  Plaintiff has past applications for disability benefits which the ALJ addressed:  On August 25, 2011, plaintiff filed his first application for benefits alleging disability beginning on September 4, 2010, due to post traumatic stress disorder, chronic bilateral knee pain, a bilateral eye condition, obstructive sleep apnea, a respiratory condition, lesions on his lungs, high cholesterol, chronic fatigue syndrome, irritable bowel syndrom, tinnitus (ringing or buzzing in the ears), a rash on his face, a left torn rotator cuff, anxiety and depression.  That application was denied initially on November 17, 2011, and again on May 9, 2012, by an ALJ (Tr. at 11).  On July 6, 2012, the Appeals Council denied a request for review.  On November 29, 2012, plaintiff filed his second application for disability benefits alleging disability beginning on May 10, 2012 (the day after the ALJ's denial in his first case), due to post traumatic stress disorder, chronic fatigue syndrome and major depressive disorder.  On January 22, 2013, that claim was denied, and plaintiff failed to request a hearing by an ALJ.  The case before me now is plaintiff's third application for disability benefits.  ALJ Carol Boorady declined to reopen plaintiff's two prior unfavorable applications (Tr. at 12).

Plaintiff's last insured date is December 31, 2016 (Tr. at 14).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date, May 10, 2012 (Tr. at 14).

Step two.  Plaintiff has the following severe impairments:  history of bilateral arthroscopic knee debridements, history of left shoulder rotator cuff repair, history of

35

medial epicondylitis, multiple pulmonary nodules stable on serial CT scans since 2007, depression, post traumatic stress disorder, and anxiety (Tr. at 14). Plaintiff also has the following non-severe impairments: "irritable colon, tinnitus, obstructive sleep apnea/chronic fatigue, low back pain, carpal tunnel syndrome, obesity and all other conditions mentioned in the evidence of record not listed as severe above." (Tr. at 14).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. a 16-18).

Step four. Plaintiff retains the residual functional capacity to perform light work except that he can lift up to 20 pounds occasionally and 10 pounds frequently; stand or walk for 6 hours per day; sit for 6 hours per day; never climb ladders, ropes or scaffolds; occasionally climb ramps and stairs; occasionally stoop, kneel, crouch or crawl; should avoid concentrated exposure to pulmonary irritants and work spaces with poor ventilation; should avoid concentrated exposure to temperature extremes, vibration and work hazards; is able to understand, remember and carry out simple instructions consistent with unskilled work; and can tolerate occasional contact with co-workers and supervisors but no contact with the general public (Tr. at 18). With this residual functional capacity, plaintiff is unable to perform his past relevant work as a corrections officer/supervisor or engineering supervisor (Tr. at 26).

Step five. Plaintiff is capable of performing other work available in significant numbers, such as assembler, labeler, or laundry aide (Tr. at 27). Therefore, plaintiff is not disabled (Tr. at 28).

## VI.    WEIGHT GIVEN TO OPINION OF TREATING PHYSICIAN

Plaintiff argues that the ALJ erred in giving more weight to state psychological consultant Mark Altomari, Ph.D., than she did to plaintiff's treating physicians -- "Dr. Jones, Dr. Sawyer[13] [sic], Dr. Bader[14] [sic], Dr. Twitty, Dr. Adams[15] [sic], Dr. Gupta, Dr. Thiele, Dr. Giacchi and Dr. Woods;" and also erred in failing to give more than "little weight" to the 90% VA disability due to service related impairments.

### Other Doctors

Interestingly, plaintiff fails to state what opinions of any of these doctors should have been given weight. I surmise that is because none of these doctors or other medical professionals provided opinions, and none of them gave any indication in their treatment records that plaintiff's impairments resulted in any functional limitations.

Plaintiff mentioned Dr. Jones once in his summary of medical records, and indeed the only visit to Dr. Jones in this record was on January 14, 2013, due to elbow pain. On that visit, Dr. Jones noted that plaintiff's carpal tunnel syndrome was resolved; his low back pain was improved; he had good attention span and displayed appropriate behavior; and, after reviewing an ultrasound and an x-ray and performing a physical exam, Dr. Jones concluded that plaintiff suffered from only "minimal degenerative changes" of the elbow.

---

[13]Becky Sawyer is not a doctor. She is a social worker.

[14]The orthopedic surgeon plaintiff saw was Dr. Kathryn Bauer, not Bader.

[15]The person who completed the paperwork for plaintiff's Caregiver Support Program was a registered nurse, not a doctor (Tr. at 404).

37

Plaintiff mentioned Dr. Bauer once in his summary of medical records, and indeed the only visit to Dr. Bauer in this record was February 7, 2013. Plaintiff had full range of motion, was tender over the medial epicondyle but nontender over the lateral epicondyle. His elbow was stable. He had no fracture or dislocation. Dr. Bauer recommended physical therapy and plaintiff declined. Dr. Bauer did not treat plaintiff and did not note any functional restrictions.

Plaintiff mentioned one medical record of a visit to Dr. Twitty, a psychiatrist, and indeed the only time plaintiff saw Dr. Twitty was July 22, 2013. Plaintiff had earlier attempted to get her to refill his anxiety medication after he had cancelled or missed multiple appointments and failed to reschedule. During this one visit with Dr. Twitty, plaintiff said he was doing OK. His mental status exam was normal. His mood was euthymic, his affect was broad, his sleep was good, his appetite was fair, his anxiety was improved, his energy was fair, his grooming and hygiene were good, his insight was good, his judgment was good, his content of thought was logical, his flow of thought was goal directed, he had decreased panic attacks and no suicidal or homicidal ideation. Dr. Twitty assigned him a GAF of 65, meaning only mild symptoms; encouraged him to get physical activity and continue his social activities; and continued him on his same medications. She did not note any functional restrictions.

Nurse Adams completed paperwork for plaintiff's Caregiver Support Program. She asked plaintiff and his wife (his backup caregiver) whether he had any new signs or symptoms or changes in mood or behavior. Plaintiff said he had increased anxiety and anger issues. His wife said he had increased depression. This occurred nine days

after plaintiff had met with his psychiatrist and reported that his anxiety was improved. His psychiatrist (Dr. Twitty) noted a normal mental status exam. Also nine days before this allegation in furtherance of his Caregiver Support Program benefits, plaintiff told his therapist, Becky Sawyer, that he was doing OK, that his symptoms were managed with his medication, that his nightmares were controlled on medication, that his mood was stable. Ms. Sawyer performed a mental status exam which was normal except he appeared "mildly depressed." Plaintiff reported improved and controlled symptoms to his treatment providers while reporting worsening symptoms in connection with a benefits program which justifies little weight being given to any opinion in Nurse Adams's paperwork. However, I note that the paperwork prepared by Nurse Adams contains nothing more than plaintiff's and his wife's allegation -- there are no medical observations or assessments, there was no treatment provided, and no functional restrictions were noted or recommended.

Dr. Gupta interpreted plaintiff's pulmonary function tests. He did not find anything abnormal, did not provide any treatment, and did not mention any functional restrictions.

Dr. Thiele never saw plaintiff. After plaintiff requested a refill of anxiety medication from Dr. Twitty, who refused to give him any until he came in for an appointment, the medical record states, "Will request approval for 1 fill with 1 refill to last until appointment from Dr. Thiele, collaborating physician." This was in reference to plaintiff's phone call to Dr. Twitty's office asking for a refill. The records do not even indicate whether Dr. Thiele approved the refill.

39

Plaintiff saw Dr. Giacchi one time. Dr. Giacchi gave plaintiff a steroid injection in his elbow. Dr. Giacchi told plaintiff to use ice and non-steroidal anti-inflammatories for elbow pain. He also told plaintiff to call if he did not get relief from the injection. Plaintiff never called Dr. Giacchi back, so it can be assumed that he did indeed get relief from this injection. Dr. Giacchi never noted any functional restrictions due to plaintiff's elbow or any other condition. In fact, he noted that plaintiff had appropriate behavior and good attention span, his muscle testing in his upper extremities was normal, and he had full range of motion in his upper extremities.

Dr. Woods supervised the steroid injection administered by Dr. Giacchi, who was a resident. Her name does not appear anywhere else in the record; she did not provide any observation, opinion, or recommendation.

Plaintiff's argument that the ALJ should have given "great weight" to the opinions of these medical professionals is wholly devoid of merit. These medical professionals did not provide opinions, and their medical records do not even remotely support plaintiff's testimony. In fact, the ALJ explicitly gave "great weight" to the medical records of Dr. Twitty, plaintiff's psychiatrist, and Becky Sawyer, plaintiff's therapist (Tr. at 24). Both of those service providers consistently found that plaintiff's mental status exams were normal and he had no uncontrolled mental symptoms.

### Service Related Disability

Plaintiff merely states in his brief that "the ALJ failed to explain why the impairments that left Plaintiff with disabilities that caused him to be 90% disabled due to 'service related' impairments" would not also result in a finding of disability under the

Case 6:14-cv-03392-REL   Document 34   Filed 09/30/16   Page 40 of 54

Social Security Act. First I note that plaintiff testified that his attorney "fought for several years" before he won that fight with the VA (Tr. at 81-82), which establishes that his disability was not a clear-cut issue even in the military; and the record reflects only that plaintiff was found to have a service-related disability without giving any information about his functional abilities. Second, I find that the ALJ adequately addressed this alleged discrepancy.

An ALJ is not bound by the disability findings of another agency. Hensley v. Colvin, 2016 WL 3878219, at *6 (8th Cir. July 18, 2016) (ALJ committed no error where he explicitly acknowledged the VA's disability finding and correctly noted that the disability finding of another agency like the VA was not binding on SSA).

The ALJ discussed each service-related impairment at length, citing to medical records in support of her finding that the service-related limitation is not the equivalent of a functional restriction for Social Security disability purposes. Because that discussion was so lengthy and so detailed, I will not quote it here (Tr. at 21-25). However, I will quote her conclusion on this issue:

> As discussed above, the medical evidence of record shows that the claimant has received a service connected disability rating of 90%, broken down as follows: PTSD (70%), emphysema, pulmonary (30%), chronic fatigue syndrome (20%), irritable colon (10%), limited flexion of the knee (10%), limited flexion of the other knee (10%) and tinnitus (10%). The Social Security Administration makes determinations of disability according to Social Security law, therefore a determination of disability by another agency is not binding on this Administration (20 C.F.R. § 404.1504; see also SSR 96-5p on issues reserved to the Commissioner). Nonetheless, under those same regulations I am required to consider the disability opinions of other agencies. Therefore, I give this opinion little weight. The issue reserved to the Commissioner herein is not whether the claimant is eligible for service connected disability benefits, but whether he has the residual functional capacity to perform work activity. The preponderance of

41

the evidence supports the conclusion that the claimant has the ability to perform work activity well within the residual functional capacity set out above.

(Tr. at 25).

Plaintiff appears to argue that his disability ratings from the Veteran's Administration constitute "opinions" of treating physicians and the ALJ should have found him disabled for this reason. Contrary to plaintiff's argument, the record contains plaintiff's disability ratings under the Veteran's Administration's regulatory scheme, but does not contain medical opinions on plaintiff's residual functional capacity. There is no record before me of any physician finding physical or mental limitations consistent with disability. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000); Brown v. Chater, 87 F.3d 963, 964-965 (8th Cir. 1996) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability).

The ALJ explicitly considered the ratings in the record for plaintiff's service-related impairments, the medical record as a whole, the objective medical evidence, plaintiff's treatment history and plaintiff's testimony before assessing his residual functional capacity. The fact that with his residual functional capacity plaintiff is capable of performing substantial gainful activity under the Social Security Act is determinative, even though plaintiff is simultaneously drawing military disability benefits.

## VII.    RESIDUAL FUNCTIONAL CAPACITY

Plaintiff next argues that the ALJ erred in assessing plaintiff's residual functional capacity because she did not consider plaintiff's "bouts with pain, which is supported by evidence, nor the evidence of his many other physical impairments or his mental

42

disorders." (plaintiff's brief, p. 27). The "other impairments" which plaintiff argues reduce his residual functional capacity are high cholesterol, elevated liver function tests, chronic fatigue syndrome, hay fever, borderline enlarged heart, mildly prominent pulmonary arteries, and plaintiff's use of a CPAP machine. In support of his argument, plaintiff cites to the VA finding of disability and plaintiff's own testimony which the ALJ properly found not credible (which is discussed below).

A residual functional capacity is the most a claimant can do despite the effects of his credible limitations. 20 C.F.R. § 404.1545. It is the claimant's burden to prove his residual functional capacity, and the ALJ must determine it based on all relevant evidence in the record. Andrews v. Colvin, 791 F.3d 923, 928 (8th Cir. 2015); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005) ("The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, including medical records, observations of treating physicians and others, and an individual's own description of his limitations"). The determination of a claimant's residual functional capacity at the administrative hearing level is the responsibility of an ALJ alone and is distinct from a medical source's opinion. Kamann v. Colvin, 721 F.3d 945, 950 (8th Cir. 2013).

The main gist of plaintiff's argument is that the VA found him disabled and so too should have the ALJ. This argument has been addressed and rejected. The list of other impairments plaintiff claims reduce his residual functional capacity are merely conditions that appear somewhere in this voluminous record. Plaintiff fails to explain how any of these conditions, alone or in combination with any other condition, diminish his residual functional capacity. I have thoroughly read the record and I have found no

evidence to support a reduced residual functional capacity based on the list of

conditions in plaintiff's argument. His sleep apnea/chronic fatigue syndrome was found

by the ALJ to be non-severe.

> Based on the findings of a June 2008 sleep study, he had been diagnosed with mild obstructive sleep apnea and was prescribed a CPAP machine to treat that condition -- a condition that his doctor had been characterizing as stable since June 2011. The claimant had also been diagnosed with chronic fatigue syndrome, also treated with CPAP therapy. The claimant had not been prescribed any medications to treat that condition. Additionally, Judge Hodum [who rendered the opinion denying plaintiff's earlier application for disability benefits] noted that the claimant had refused to undergo a second sleep study to further examine these impairments.

> Since Judge Hodum's decision, in February 2013 the claimant's social worker noted that the claimant was using his CPAP machine without oxygen. He told her that at the 2009 evaluation, oxygen had not been ordered to be used with his CPAP machine. She noted that if the claimant needed oxygen, he would need to undergo a reevaluation. There is no medical evidence of record that the claimant did so.

> In May 2013, the claimant complained to his primary care provider Nurse Practitioner Stephanie Granneman of fatigue, but admitted that he was using his CPAP machine rarely -- maybe only once a week, if even that -- because he did not like his mask. Ms. Granneman noted that the claimant [c]ould go by the sleep lab to get nasal pillows for his CPAP and she encouraged him to use the device on a daily basis. Therefore, the claimant went to the sleep study clinic and was residzed for and was given a new mask. During a June 2013 pulmonary consult, the claimant report that he was compliant with his CPAP machine and the doctor noted that this condition was stable. However, the claimant testified at the hearing that if the mask falls off during the night, he does not put it back on.

(Tr. at 15).

I also note that plaintiff told his therapist that he goes to bed late, that he stays

up late watching television and drinking caffeinated tea, that he takes naps during the

day, and that he is comfortable with this routine. This suggests that plaintiff's daytime fatigue is a result of his lifestyle choice as opposed to a medical impairment.

I find that the substantial evidence in the record supports the ALJ's residual functional capacity assessment, and that the conditions listed by plaintiff in his brief do not result in more restrictions than those accounted for in the ALJ's residual functional capacity assessment.

## VIII.  ANALYSIS AT STEP FIVE

Plaintiff argues that the ALJ erred in finding at step five of the sequential analysis that plaintiff is capable of performing other work available in significant numbers in the national economy. This argument is based on the vocational expert testimony that a person who needs to lie down during the day or who had to miss more than two days of work a month would be unemployable. Plaintiff also cites his own testimony that his carpal tunnel syndrome prevents him from doing assembly work, and his inability to focus and his propensity to "start just punching and doing dumb things again" also make him unemployable.

The ALJ rejected plaintiff's testimony that he needs to lie down and nap during the day because of his impairments. That issue was addressed above, and I find that the record supports the ALJ's finding. The medical record of treating physician Dr. Jones indicates that plaintiff's carpal tunnel syndrome is "resolved." On that day, plaintiff said his hands were not falling asleep and that he had no weakness in his hands. Plaintiff had full range of motion in his upper extremities and normal muscle testing in his fingers, wrists, elbows and shoulders.

45

The medical records do not support plaintiff's allegation that he is so unable to focus that he cannot work. On January 14, 2013, Dr. Jones noted that plaintiff displayed a good attention span. On May 30, 2013, plaintiff told his therapist that he had no problems staying focused. On July 22, 2013, Dr. Giacchi noted good attention span. On July 25, 2013, plaintiff told his therapist that he was not having any problems staying focused. On September 26, 2013, he told his therapist that he was not having any problems staying focused. The only allegations in the record of a difficulty focusing are in plaintiff's testimony.

Additionally, the medical records do not support plaintiff's allegation of an uncontrollable desire to "start punching and doing dumb things." On January 14, 2013, Dr. Jones noted that plaintiff displayed appropriate behavior. On January 31, 2013, plaintiff told his therapist that his mood and irritability were stable. On February 26, 2013, plaintiff denied any changes in behavior; his mood was described as calm. He said his mood swings were under control. On March 22, 2013, plaintiff reported stability in both his mood and irritability. On May 30, 2013, plaintiff continued to report stability with his mood. On July 22, 2013, Dr. Giacchi noted that plaintiff's behavior was appropriate. That same day Dr. Twitty noted that his mood was euthymic. On July 25, 2013, plaintiff reported stability with both his mood and irritability. On September 26, 2013, his therapist observed that his mood was pleasant and cooperative. He continued to report stability with both mood and irritability. Finally, the nurse and social worker who visited plaintiff's home in connection with his Caregiver Support Program benefits were aware that plaintiff had guns in the home; his family members were

46

The medical records do not support plaintiff's allegation that he is so unable to focus that he cannot work. On January 14, 2013, Dr. Jones noted that plaintiff displayed a good attention span. On May 30, 2013, plaintiff told his therapist that he had no problems staying focused. On July 22, 2013, Dr. Giacchi noted good attention span. On July 25, 2013, plaintiff told his therapist that he was not having any problems staying focused. On September 26, 2013, he told his therapist that he was not having any problems staying focused. The only allegations in the record of a difficulty focusing are in plaintiff's testimony.

Additionally, the medical records do not support plaintiff's allegation of an uncontrollable desire to "start punching and doing dumb things." On January 14, 2013, Dr. Jones noted that plaintiff displayed appropriate behavior. On January 31, 2013, plaintiff told his therapist that his mood and irritability were stable. On February 26, 2013, plaintiff denied any changes in behavior; his mood was described as calm. He said his mood swings were under control. On March 22, 2013, plaintiff reported stability in both his mood and irritability. On May 30, 2013, plaintiff continued to report stability with his mood. On July 22, 2013, Dr. Giacchi noted that plaintiff's behavior was appropriate. That same day Dr. Twitty noted that his mood was euthymic. On July 25, 2013, plaintiff reported stability with both his mood and irritability. On September 26, 2013, his therapist observed that his mood was pleasant and cooperative. He continued to report stability with both mood and irritability. Finally, the nurse and social worker who visited plaintiff's home in connection with his Caregiver Support Program benefits were aware that plaintiff had guns in the home; his family members were

46

aware that plaintiff had guns in the home. If anyone close to plaintiff believed he had an "uncontrollable" desire to become violent, one would think someone would have suggested removing those weapons from plaintiff's home.

The only remote suggestion in the record of plaintiff's possible propensity to "start punching and doing dumb things" was his refusal to participate in physical therapy believing he knew his body better and knew it would not work. Failure to follow a prescribed treatment without good reason is grounds for denying a disability claim -- it is not evidence supporting disability as plaintiff argues here. Chaney v. Colvin, 812 F.3d 672, 678 (8th Cir. 2016).

## IX.   HYPOTHETICAL QUESTION

Plaintiff argues that the ALJ erred in posing an inadequate hypothetical question to the vocational expert because the hypothetical relied on by the ALJ did not include sufficient limitations for plaintiff's mental impairments, pulmonary conditions, or borderline enlarged heart.

A hypothetical to a vocational expert need only include impairments that the ALJ finds credible and supported by the record as a whole. Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014); Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006). A vocational expert's testimony based on a properly phrased hypothetical question constitutes substantial evidence. Goff v. Barnhart, 421 F.3d at 794. Based on my review of the record and the above discussions, I find that plaintiff's argument is without merit. The hypothetical relied on by the ALJ included all of the impairments the ALJ

found credible, and the substantial evidence in the record supports the ALJ's finding on this issue.

## X.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Plaintiff provides no specific factual argument but instead provides five pages of boilerplate law on the issue of credibility.

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and

48

examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

Following is a summary of the specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability:

Claimant was told he would need to undergo a reevaluation in order to get oxygen with his CPAP, but he never did that. He complained of fatigue, but at the time was only using his CPAP rarely. Later when the records reflect that claimant was compliant with his CPAP, his doctor found his sleep apnea to be stable. Although claimant testified about his hands being numb and weak, his doctor found that his carpal tunnel syndrome was resolved. Although claimant testified about back pain, he told his doctor his back was doing well and his doctor found his low back pain to be improved. Claimant walks his dog for 50 minutes at a time, the records reflect that he had gotten a pool and was using that, he reads history and collects Civil War items, he watches television including the History Channel and the news, he mows the yard, and he works on his father's classic car. Claimant told his doctor that he had been socializing with other Veterans, and he told his therapist he was staying busy with his family.

Claimant is capable of playing on the computer and he was taking college courses.

Claimant's alleged onset date is the day after an ALJ denied a previous application for disability benefits, not due to some worsening of his impairments. There is no record of any treatment of any kind for the eight months following claimant's alleged onset date. The SSA interviewer who met face to face with claimant observed no evidence of any physical or mental impairment, and claimant demanded to be approved for SSA disability benefits under the wounded warrior provisions.

Although claimant came into the hearing bent over with his cane, he testified that his pain was from his knees, not his back, which would not explain why he was bent over. Although his behavior during the hearing made it appear he had a lot of pain with sitting, he testified that sitting was not really a problem, and he appeared to become more comfortable sitting as the hearing went on. Although claimant testified he could not lift more than 10 pounds, the medical records show that he experienced pain in his elbow after lifting something heavy.

Claimant's work record is good; however, his last job ended after he ordered his staff to watch the door while he roughed up inmates. While he attributes this incident to his mental impairments, the fact that he ordered his subordinates to watch the door supports the conclusion that he knew what he was doing was wrong and took measures to avoid detection as opposed to acting uncontrollably. He testified that he no longer hunts because gunfire triggers flashbacks, but he told his therapist he wanted to be able to hunt next season.

In the prior decision, Judge Hodum concluded that claimant's current unemployment might be the result of a lifestyle choice. He noted that the claimant had testified that he received both service-related disability benefits through the VA and private long-term disability insurance benefits connected to his prior employment with the state. He noted that as long as claimant did not

engage in substantial, full-time employment, he would continue to receive payments and therefore had no motivation to acquire gainful employment. The fact that claimant is alleging progressively worsening conditions, yet has sought so little medical treatment since Judge Hodum's decision supports this conclusion as well.

The record shows that claimant has been noncompliant with treatment recommendations. He missed or cancelled appointments, he refused a referral to physical therapy, and he rarely used his CPAP.

There is no evidence in the record (in this case or the prior decision) that claimant was told he needs knee replacements. No medical record in either case indicates that claimant was advised to use a cane. Claimant has not sought medical treatment for his knees or his shoulder since Judge Hodum's decision. He did seek treatment for his elbow, which was found to have full range of motion, no osseous abnormality, and only minimal degenerative changes. Claimant refused physical therapy which was the treatment recommended. After he got a steroid injection in his elbow, he sought no further treatment and never called for a follow up, indicating he got the expected relief from the shot.

Claimant's total lung capacity is normal, and his lung testing has been stable on various scans dating back to 2008.[16] Claimant denied any symptoms and his treatment providers recommended no treatment or follow up for pulmonary nodules.

Claimant sees a social worker every 2 or 3 months for therapy. His mental status exams have been normal. Claimant's daughter and wife were approved to be his caregivers under the VA's Caregiver Support Program, the benefits of which include a monthly stipend, mental health and respite services, healthcare coverage and travel and lodging per diem for attending training and

---

[16]This is despite plaintiff's testimony that his doctor said plaintiff's were the second worst lungs she had ever seen.

appointments.  An in-home assessment by a social worker using a scoring guide to determine if claimant was eligible for these services resulted in a score of 10 indicating a low level of dependence.  Nonetheless, claimant was found to be eligible for caregiver services due to his mental health condition.  Subsequently, claimant reported to his treatment providers that he was doing OK, that he was working on his father's classic car.  A depression screen score was zero indicating claimant was negative for depression.  Claimant told his therapist that his symptoms were managed with medication.  He also said he spends a lot of time at home because his wife does and he wants to be with her, not because his conditions cause him to be homebound.

Claimant was routinely found to be pleasant and cooperative.  His nightmares were noted to be managed with medication.  Claimant regularly reported stability with his mood and with his irritability.  He reported no problems staying focused.  The lowest GAF score claimant was ever assessed was 65 indicating only mild symptoms.

The record contains no opinion from any treating or examining physician indicating that claimant is disabled or has significant restrictions.  He last sought treatment for any condition seven months prior to the hearing in this case.

(Tr. at 20-26).

 The ALJ found plaintiff's complaints not entirely credible for several reasons, including inconsistencies in the record; the absence of objective medical evidence to support plaintiff's claims; his treatment history, including his minimal treatment after the last ALJ decision, his missed appointments, and his failure to follow treatment recommendations; his daily activities; and his lack of motivation to work.  Because substantial evidence supports the decision to discount plaintiff's subjective complaints, and because the ALJ provided good reasons for doing so, the ALJ's credibility finding

will be affirmed.  Turpin v. Colvin, 750 F.3d 989, 993-994 (8th Cir. 2014); McDade v. Colvin, 720 F.3d 994, 998 (8th Cir. 2013).

## XI.    CONCLUSIONS

Plaintiff presented a total of ten separate arguments for reversal in his brief.  I have thoroughly read and considered each argument and find that several of them were essentially duplicates and that plaintiff has raised no point of error justifying reversal of the ALJ's decision.

Ten days before his alleged onset date, plaintiff testified under oath that he was not using a cane, that he was doing pretty good since his knee surgery in 2007; that his shoulder and knee pain were not as bad as his lungs, and that his medications pretty much took care of his lung pain; that medications and exercise helped his knee and shoulder pain; that as of May 1, 2012, his main disabling condition was his temper combined with fatigue; that he gets 8 hours of sleep a night, but he sometimes needs to take naps during the day if he stays up late watching movies with his kids; that he was taking 9 college credit hours; that on days he does not attend classes, he goes to his kids' sporting events; and that he could lift 100 pounds 12 to 15 times over an 8-hour period.  From that point until the end of plaintiff's medical records, there is no evidence of worsening symptoms.  The records establish that plaintiff's obstructive sleep apnea was stable; his carpal tunnel syndrom was resolved; his back pain was resolved; his elbow had only minimal degenerative changes and he got good relief with a steroid injection; his pulmonary function tests were essentially normal and he denied respiratory symptoms; his mental status exams were normal; he denied any difficulty

focusing and was observed to have no difficulty focusing; his irritability, mood and nightmares were managed with medication; and although plaintiff testified that he stays home most of the time because he does not like to be around people, he actually stated in the records that he stays home to be with his wife, and the medical records reflect many times when treatment providers tried to reach him and he was not at home or at any medical appointment.

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 30, 2016